# UNITED STATES DISTRICT COURT
## for the
### Eastern District of California

**FILED**

DEC 21 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. |
| ) | |
| KAO XIONG ) | 2:17-MJ--216 DB |
| ) | |
| _____ ) | |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  June 24, August 2, and December 14, 2017  in the county of  Butte  in the

Eastern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(e) | Whoever, through the use of the mail...or other instrument of interstate or foreign commerce, or in and affecting interstate or foreign commerce...willfully makes any threat, or maliciously conveys false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive.... |

This criminal complaint is based on these facts:

(see attachment)

**SEALED**

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Scott C. Wales, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Dec. 21, 2017

_____
*Judge's signature*

City and state:  Sacramento, California

Deborah Barnes, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR
# SEARCH WARRANT AND CRIMINAL COMPLAINT

I, Agent Scott C. Wales, being duly sworn, declare and state as follows:

## **INTRODUCTION**

1.      I am an investigative or law enforcement officer of the United States within the meaning of 18. U.S.C. § 2516. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since February 2011. I am currently assigned to the FBI's Chico Resident Agency of the Sacramento Field Division. Previously, I was assigned to the Joint Terrorism Task Force (JTTF) operating in the FBI's Orange County Resident Agency of the Los Angeles Field Division. Since entering duty, I have conducted numerous counterterrorism investigations. As a result of my experience, I am familiar with domestic terrorism tactics, methods, tradecraft and techniques. I have attended numerous trainings regarding counterterrorism, traveled overseas in connection with sensitive counterterrorism matters, and served numerous search warrants related to counterterrorism investigations.

2.      I make this Affidavit under Rule 41 of the Federal Rules of Criminal Procedure in support of an application for the search of the following for the property and items described in Attachment B to this Affidavit as well as any digital devices or other electronic storage media located therein:

    a.  1970 Elgin Street, Oroville, CA 95966 ("the SUBJECT RESIDENCE"), which is the residence of KAO XIONG ("XIONG"), as more fully described in Attachment **A-1** to this Affidavit. The search is to include all rooms, attics, basements, garages, storage rooms, trash containers, outbuildings of any kind, attached or unattached, and all other areas within the curtilage;

    b.  The person of Kao Xiong, ("the SUBJECT PERSON "), including major case prints, which includes prints of all ridges on each hand including the ten digits and palms,[1] as more fully described in Attachment **A-2** attached to this Affidavit; and

---

[1] Although a search warrant is not required to obtain fingerprints, we are including a request for major case prints in this warrant.

c. XIONG's Vehicle, a 1996 black Honda Civic ("the SUBJECT VEHICLE") bearing California license plate 3SHB677, Vehicle Identification Number (VIN) 1HGEJ7126TL057559 and registered through the California Department of Motor Vehicles to KAO XIONG, as more fully described in Attachment **A-3** attached to this affidavit.

## Legal Definition of Offenses

3.      Based on my training and experience and the facts set forth in this Affidavit, there is probable cause to believe that Kao XIONG, (hereinafter referred to as "XIONG"), has committed the following violations:

a.    18 U.S.C. § 115, which makes it a crime in pertinent part to:

        i.    assault, kidnap, or murder, or attempt or conspire to kidnap or murder, or threaten to assault, kidnap or murder a member of the immediate family of a United States official, . . . [or] a Federal law enforcement officer; or

        ii.    Threatens to assault, kidnap, or murder a United States official, . . . [or] a Federal law enforcement officer

with intent to impede, intimidate, or interfere with such official…or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official . . . or law enforcement officer on account of the performance of official duties.

b.    18 U.S.C § 871(a) states, in pertinent part:

        i.    Whoever knowingly and willfully deposits for conveyance in the mail . . . any document containing any threat to take the life of, to kidnap, or to inflict bodily injury upon the President of the United States . . . .

c.    18 U.S.C § 844(e) states, in pertinent part:

        i.    Whoever, through the use of the mail . . . or other instrument of interstate or foreign commerce, or in and affecting interstate or foreign commerce . . . willfully makes any threat, or maliciously conveys false information knowing the same to be false, concerning

2

an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive . . .

d. 18 U.S.C. § 875(c), which makes it a crime to:

    i. Transmit in interstate or foreign commerce any communication containing any threat to injure the person of another.

e. 18 U.S.C § 876(b), which makes it a crime to:

    i. With intent to extort from any person any money or other thing of value, so deposit, or cause to be delivered, as aforesaid, any communication containing any threat to kidnap any person or any threat to injure the person of the addressee or of another.

f. Title 18 U.S.C § 1038(a)(1), which makes it a crime to:

    i. Engage in any conduct with the intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 39, 40, 44, or 113B of Title 18.

4. A joint investigation was conducted by the United States Secret Service (USSS), United States Postal Inspection Service (USPIS) and the FBI, collectively referred to as the "Investigating Agencies." Based on information obtained in the investigation, there is probable cause that there exists evidence of the above criminal violations in the SUBJECT RESIDENCE, SUBJECT VEHICLE, and on the SUBJECT PERSON.

**Charges in the Complaint**

5. This affidavit is also made in support of an application for an arrest warrant for Kao XIONG, with a date of birth February 15, 1984, currently residing at the SUBJECT RESIDENCE.

6. As further discussed in this affidavit, there is probable cause to believe that XIONG has violated 18 U.S.C. § 844(e).

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT
AND CRIMINAL COMPLAINT

7.     Count One of the complaint refers to a letter sent via the United States mail to the Mall of America 60 E Broadway, Bloomington, MN 55425. The letter was postmarked on June 24, 2017, and is described more fully below.

8.     Count Two of the complaint refers to a letter sent via the United States mail to Yahoo Corporate Office Headquarters HQ Address: 701 First Avenue Sunnyvale, California 94089 USA. The letter was postmarked on August 2, 2017, and is described more fully below.

9.     Count Three of the complaint refers to a letter postmarked on December 14, 2017 and mailed to FBI 220 W Ridgeway Ave Waterloo, IA 50701.

10.     The facts in this Affidavit come from my personal observation, my training and experience, and information obtained from other agents and witnesses. This Affidavit is only intended to show that there is sufficient probable cause for the requested arrest warrant and search warrant, and does not set forth all of my knowledge or investigation into this matter. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

## STATEMENT OF PROBABLE CAUSE

### Summary of Investigation

11.     The Investigating Agencies have probable cause to believe that XIONG has created and caused to be mailed over 150 threat and/or hoax letters targeting the United States President (POTUS), former POTUS, a Federal Law Enforcement Officer (FLEO), family of POTUS and a FLEO, FBI offices, State Agencies, private businesses and civilians since January 2017. The hoax/threat letters include death threats, bomb threats, assassination, extortion demands, and white powder. XIONG was interviewed on two separate occasions: once by USSS in February 2017 and once by FBI in August 2017. In both interviews, XIONG denied having sent any threat/hoax letters. Hoax/threat letters continued to be mailed after each of the interviews. XIONG's behavior escalated after the FBI interviewed XIONG in that some of the letters included the name and work address of the interviewing agent ("FBI Special Agent 1") who had provided XIONG with his business card, and some letters included threatening comments to FBI Special Agent 1 and FBI Special Agent 1's family. In addition, a white powdery substance was included in the envelopes of some of the letters.

The letters were assessed by a laboratory to be negative for harmful biological agents. To date, the Investigating Agencies have discovered two mail boxes in Oroville, California where the letters are being deposited into the U.S. mail and have recovered 78 letters before they were delivered to the addressees. The Investigative Agencies have probable cause to believe that XIONG is creating and mailing the threat and hoax letters because, among other evidence discussed in this affidavit, the Investigative Agencies know that the SUBJECT VEHICLE was in the vicinity of each of these mail boxes prior to the recovery of these letters. Based on the evidence gathered during the investigation, there is probable cause to believe that XIONG has violated the statutes cited above by mailing threat and hoax letters and by providing material false statements to law enforcement when he falsely denied mailing such letters.

### Oroville, California Postal Service

12.     The U.S. Mail within the City of Oroville can be dropped off into any mail receptacle and is picked up by either the Letter Carrier assigned to a particular route or by a Collections Clerk. The mail is then forwarded to the Oroville Post Office for dispatch. A truck driver picks up outgoing mail from the Oroville Post Office in the afternoon and transports the mail to the U.S. Postal Service Plant and Distribution Center (hereinafter "U.S. Postal Plant") in West Sacramento, California. The mail is then placed into the mail stream for processing. The letters go through processing equipment for delivery to their intended recipient, which is the address listed on the front of the envelopes. Letter mail that is processed through W. Sacramento U.S. Postal Plant is stamped "Sacramento CA 957," with the date and time it is processed listed below the stamp.[2] This stamp appears on the upper right side of the envelope.

### Threat and Hoax Letters

13.     In this case, each of the letters that bear a post-mark contain the stamp, "SACRAMENTO CA 957."[3] A common theme in the letters is the reference to a group the

---

[2] This paragraph is not intended to infer that all mail marked "Sacramento CA 957" comes from Oroville, California. However, the inverse is always true, all mail from Oroville, California will be post-marked "Sacramento CA 957."

[3] Some of the letters identified in this investigation that were received by the addressee did not contain a post-mark.

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT
AND CRIMINAL COMPLAINT

author refers to as the "Unstoppable Force." Many of the letters appear to be poison-pen style in that they provide names and addresses of Person 2 who XIONG formerly resided with, Person 2's family and associates, and XIONG's own family, and identify these individuals as the "Unstoppable Force," in an apparent attempt to direct a law enforcement response toward them. Some of the letters contained a white powder, which, after testing was determined to be flour. The letters have resulted in the expenditure of significant government resources and have victimized innocent civilians. Most of the letters have been processed through a laboratory. Due to the letters containing white powder, the collection of all subsequent letters the Investigative Agencies suspect are related threat/hoax letters, requires a specialized response by someone trained in Weapons of Mass Destruction (WMD). The threats against POTUS, former POTUS's, and FBI Special Agent 1 and his family, as well as the numerous threats of a pipe bomb have resulted in the expenditure of significant taxpayer dollars in the form of many investigative hours by both local and federal law enforcement, including the Sunnyvale, CA Police Department, the Dallas Fort Worth Airport Police Department, the USSS, USPIS, and the FBI.

14.     Based on the evidence to date, XIONG is believed to have begun mailing threat and hoax letters in January 2017. On January 6, 7, and 20, 2017, letters were sent to former POTUS George W. Bush. One or more of the letters included the words, "Snipe George W. Bush," "PIPE BOMB( DONALD TRUMP, OBAMA AND GEORGE W BUSH house.)," "[Person 1] is very good at sniping." One or more of the letters includes the name of Person 2 along with Person 2's address in Minnesota. One or more of the letters purports to provide the names of the individuals involved in the Unstoppable Force and reports, "they are planning to pipe bomb the WHITE HOUSE and the named below: DONALD TRUMP, OBAMA, GEORGE W BUSH." A duplicate letter was sent to Obama in Chicago, Illinois on January 6, 2017.

15.     On January 12, 2017, a bomb threat letter was received at the Dallas Fort Worth (DFW) Airport Headquarters. The letter was addressed to "DFW International Airport, 2400 Aviation Drive, DFW Airport, TX 75261" with no return address. The letter reads, "Pipe Bomb, Everyone is going to die…1/25/17…Team: Unstoppable Force!!!!!! [full name of Person 6] aka Pornstar Hackernet….[Address 1] Fridley, MN 55432" The person

6

who opened the letter was immediately alarmed and notified their supervisor. The airport notified the DFW airport police department, who responded by first checking the envelope for hazardous materials. DFW Airport Police took a report of a Terroristic Threat. DFW Airport Police notified the FBI within one hour of receiving the threat letter.

16.     A letter post-marked January 20, 2017 was addressed to the Trump Organization in New York City, New York. The letter was entitled, UNSTOPPABLE FORCE" and further stated, "Pipe Bomb and kill all Donald Trump families. They are known as the unstoppable force. They got their information that they need to bomb each place." The letter then lists purported members of the "Unstoppable Force," and addresses of various Trump properties and the White House. The letter concludes with "PIPE BOMB HOUSE AND ORGANIZATION. SNIPE AND POISON." The same letter was sent to the Central Intelligence Agency (CIA), postmarked on January 21, 2017.

17.     On January 26, 2017, a letter was sent to the Office of George W. Bush stating, "UNSTOPPABLE FORCE, ASSASSIN AND PIPE BOMB [Proceeded by photographs and names of GEORGE W BUSH, Laura Bush, Barbara Bush, and Jenna Bush Hager], We are the UNSTOPPABLE FORCE, we know all about your family."

18.     On February 2, 2017 a letter was sent to the Trump Tower at 721 Fifth Avenue New York, NY. The return address was "Unstoppable Force" at Address 1 in Fridley, MN. One page of the letter states in part, "Donald Duck, you are stupid and can lick my wife pussy. I am an immigrant. We're a team for a long time. Your country and my country we fight in war together in Laos. Now that you duck have passed the new law I can't go visit my country. I am going to assassinate your family with my son gun. Person 1 and I go wild hogs together in Texas, so I will shoot you like pigs. I going to fuck your daughter like a pig." A second page states "Unstoppable Force," "Assassin and Pipe Bomb," and then lists the names and photographs and President Trump and six family members. The letter also lists the name of three individuals purportedly in the unstoppable force. Based on publicly available information, I know that Donald Trump is sometimes compared to Donald Duck, and that individuals dressed in Donald Duck costumes appeared at some of Donald Trump's campaign rallies in 2016.

19.     The threat letters culminated in a response by the United States Secret Service (USSS). USSS first identified and interviewed Person 2, who was named in various letters. Person 2 told USSS that Person 2 had a relationship with XIONG between 2001 and 2015. Person 2 also informed USSS that Person 2 has obtained restraining orders against XIONG in January and February 2016 because he had repeatedly threatened and stalked Person 2. Person 2 indicated that Person 2 has no knowledge of the threat/hoax letters, is not familiar with the "Unstoppable Force," and does not know anyone by the name Person 1 (another individual identified in numerous letters), but that XIONG had accused Person 2 of having a relationship with someone named Person 1. Person 2 also told USSS that XIONG is a frequent user of Methamphetamine.

20.     On February 10, 2017, USSS interviewed XIONG in Minnesota while XIONG was visiting from California. XIONG was adamant that Person 2 has a relationship with Person 1. XIONG adamantly denied authoring or having any knowledge of the letters. When confronted with the fact that the letters had been post marked near his residence in California, XIONG replied that he did not mail any letters from "Sacramento." Notably, USSS had not mentioned that the letters were mailed from Sacramento.

21.     After the USSS interviewed XIONG, the letters continued. On April 24, 2017, three identical letters were sent to the White House, George W. Bush, and the FBI office in Sacramento, California. The letters stated, "Black List...Kill List, proceeded by photographs and names of: DONALD TRUMP, IVANKA TRUMP, ERIC TRUMP, DONALD TRUMP JR., TIFFANY TRUMP, GEORGE W. BUSH, BARBARA BUSH, OBAMA BARACK, and MICHELLE OBAMA. They hired us to kill all of Donald Trump family. Xiong family have bought a land and making pipe bomb... inside there is lots of gun and shooting for target practice...FUCK THE FIB[sic]."

22.     On May 9, 2017, a letter was sent to the FIB[sic] and addressed to the FBI office in Sacramento, California, stating, "PIPE BOMB THAT IS GOING TO KILL ALL IN RANG[sic] AREA..........TO THE MAILING ADDRESS." An identical letter was sent to the Minneapolis Social Security Office on May 11, 2017.

23.     On May 27, 2017 at 9:28 AM EST, an email was submitted to the White House from the email address [Person 2's full name].86@gmail.com. The email indicates it

is from Person 5 who has the last name XIONG, and Address 1 but in Mounds View, MN rather than Fridley, MN. The message states, "This is your last white trash warning, get the fuck out of begin a President. Our force hates your bull shit talk all the time, If you don't were going to bomb your whole family. We know all the address were they live. FORCE BY (SKK-AZ)" The email was sent from an IP address in Gridley, CA, which is where XIONG's work is located.

    24.    On June 22, 2017, a letter was sent to the WHITE HOUSE stating, "UNSTOPPABLE FORCE, The reason why they are named the UNSTOPPABLE FORCE is that no FBI will stop them. They are planning to bomb all Donald Trump Family because of immigration., Next week [name of Person 1] will send a real bomb..., [name of Person 1] dad sever[sic] in the Laos war and he know how to make bomb." A black powdery substance was taped to the sheet of paper under the header, "Opium here." An identical letter was sent to the Minneapolis Social Security Office. A WMD response ensued and the letter was sent to a laboratory. Test results from the Minnesota Department of Health Public Health Lab state in relevant part, "To a reasonable degree of scientific certainty, the black powder was determined to contain a combination of Morphine, Codeine, and Acetaminophen. Papervine, and Narcotine were identified but not confirmed."

    25.    On June 24, 2017, letters were sent to the Minneapolis-St. Paul Airport (MSP), the Mall of America, and the Hennepin County Human Services and Public Health Department. Each of the letters were identical and stated, "UNSTOPPABLE FORCE, I AM [name of PERSON 1] AND I GOING TO BLOW THIS BUILDING. FUCK THE POLICE AND THE FIB[sic]…"

    26.    On July 6, 2017, as a result of the numerous hoax/threat letters, Investigators from the Minneapolis FBI office and Saint Paul Police Department interviewed Person 2, who resides in Minnesota. Person 2 explained to FBI special agents that Person 2 previously had a relationship with XIONG but that XIONG had become involved in drugs and they ended their relationship. Person 2 stated that XIONG became "crazy" when their relationship ended and Person 2 had to get a restraining order. At the time of the interview, law enforcement confirmed that a restraining order was in effect. Person 2 was shown images of the threat/ hoax letters that had been sent to various local and federal agencies and

9

organizations. Person 2 recognized nearly all the names mentioned in the letters and stated that they were either family members of Person 2 or XIONG. She also stated that XIONG had family in Oroville, California. Person 2 recognized the name Person 1 as a person selected by XIONG's family to assist in restoring the relationship between Person 2 and XIONG, but Person 2 said Person 2 did not know who Person 1 was and had nothing to do with him.

27.     On August 2, 2017, letters were sent to Yahoo, Inc., New York Times, and Myspace LLC. The letters were identical and stated, "I am one of the UNSTOPPABLE FORCE..., I am just informing that we are going to bomb this location. The reason is that they had my family hold as hosted." Yahoo, Inc. contacted the Sunnyvale Police Department to report the bomb threat. A Yahoo! employee told police that they were concerned that the threat was more credible because it was sent locally. The letter and envelope were immediately transported to the Sunnyvale Crime Lab and processed. The Crime Scene Investigator swabbed the adhesive portion of the envelope as well as under the address label for potential DNA evidence. The letter was processed for latent prints and one fingerprint was found. The letter was also reported to the FBI.

## FBI INTERVIEW OF XIONG

28.     On August 18, 2017, FBI Agents interviewed XIONG at his place of employment, Mary's Gone Crackers, a factory located at 100 Kentucky Street, Gridley, California 95948. XIONG confirmed he was currently residing at 1970 Elgin Street, Oroville, California 95965, the SUBJECT RESIDENCE, and had been living there for about six months. XIONG moved to California after living in Minnesota for 16 years. XIONG acknowledged that he previously resided with Person 2 who had filed two restraining orders against him for domestic violence and harassment. Agents showed XIONG multiple threat and/or hoax letters mailed to the Oakland FBI office, the Hennepin County Human Services and Public Health Department, the DFW Airport, and the New York Times. The letters contained similar language, addresses, and photographs. XIONG denied having written, mailed, or having had any involvement with the letters. XIONG stated that when he was living in Minnesota, FBI Agents interviewed him regarding another threatening letter, in which he also denied having any involvement.

10

29. XIONG stated that he has never had any military or explosives training and has no intentions of hurting himself or others. XIONG stated that he does not have access to any weapons. At the conclusion of the interview, FBI Special Agent 1 gave XIONG a business card at XIONG's request.

## Post FBI Interview of XIONG

30. On August 28, 2017, a letter was sent to a private law office in Minneapolis stating, "UNSTOPPABLE FORCE, PIPE BOMB!!!!![proceeded by a photograph of an IED].

31. On September 11, 2017, a letter was sent to the FBI office in New Orleans, stating, "This is the guy who hired me to plant a pipe bomb. I just make it and send it to him...They told me that it was going to be in September...after they paid me they also hired some guy and try to kill me...UNSTOPPABLE FORCE, PIPE BOMB!!!![proceeded with a photograph of an IED].

32. Between September 13th and 15th, 2017, identical letters were sent to Ronald Reagan, George H.W. Bush, Barack Obama's, and George H.W. Bush, stating, "UNSTOPPABLE FORCE, PIPE BOMB!!!![followed by a photograph of an IED]."

33. On September 19, 2017, USPIS Inspector Roxanne LeMaire was notified by the West Sacramento US POSTAL PLANT about a stack of 17 letters with an unknown white powder inside that had leaked all over the letters. A preliminary test on the unknown powder resulted in a 99% confidence as non-hazardous Farina Mills wheat. Inside each envelope were the same four pages of printed material and about 5 milliliters of the white powder. The letters accused various individuals of using and/or importing opium and contained the words, "Unstoppable Force" and "Psion[sic] powder." The last page of each letter included photographs and names of United States Representatives.

34. The letters were retrieved from the outgoing mail slot inside a Neighborhood Delivery Collection Box Unit ("NEIGHBORHOOD COLLECTION BOX"), which is the group residential mailbox, located on the south side of West Way, between 18th Street and Mountain Vista Drive, in Oroville, California.

35. The letters were addressed to be mailed to the following recipients:

a. George W. Bush, 10141 Daria Pl, Dallas, TX 7522

11

b. Federal Bureau of Investigation, 1501 Freeway Blvd, Brooklyn Center, MN 55430

c. I Am Hmong TV, 995 University Ave W, St Paul, MN 55106

d. Hmong TV, 417 University Ave W, St Paul, MN 55103

e. Vue Legal, LLC, 155 Wabasha St S#110, St Paul, MN 55107

f. Federal Bureau of Investigation, 316 Robert St N #368, Saint Paul, MN 55101

g. Public House, 695 Grand Ave, Saint Paul, MN 55105

h. The Trump Organization, 725 Fifth Avenue, New York, NY 10022

i. Clinton Foundation, 1271 Avenue Of The Americas Fl 42, New York, NY 10020

j. Hmong TV Newtwork Inc, 1113 Dayton Ave # 5, Clovis, CA93612

k. Kpnp 1600 AM, 6500 Brooklyn Blvd, Minneapolis, MN 55429

l. Lao Family community of Minnesota, 320 University Ave W, Saint Paul, MN 55103

m. Research Department Minnesota House of Representatives, 600 State Office Building, St. Paul, MN 55155.

n. The Hmong Company, 1670 S Robert St # 308, West St Paul, MN 55118

o. Ronald Reagan, 1600 Pennsylvania Ave NW, Washington, DC 20500

p. Lo Law Firm, 3252 Rice St, St Paul, MN 55126

q. Moua Law Office, 261 Ruth St N, St Paul, MN 55119

36.    XIONG's Aunt, Uncle and cousin currently reside at an address in Oroville, CA, at a residence that is approximately 0.3 miles away from the stated NEIGHBORHOOD COLLECTION BOX. XIONG previously resided at his aunt and uncle's Oroville residence for approximately one year until he moved to the SUBEJCT RESIDENCE, which is approximately 5 miles away from the NEIGHBORHOOD COLLECTION BOX on West Way.

37.    On September 25, 2017, SA Catalano and USPIS LeMaire interviewed Oroville Post Office City Letter Carrier Susan Holley regarding the mailing of the letters on September 19, 2017. Holley stated that the mailing of the letters has been on-going since January 2017 and they had been mailed throughout the year, approximately 1-3 times per

12

week. Holley advised the letters always seem to be addressed to Trump, Bush, Reagan, the White House, and multiple Hmong businesses. Holley said the letters she encountered were always mailed from the same NEIGHBORHOOD COLLECTION BOX outgoing mail slot located on West Way in Oroville, CA. Holley advised the envelopes were the same, white envelopes with a white computer generated label and no return address. As far as Holley was aware, none of the letters that she encountered prior to September 19, 2017, contained a white powder.

38.    Two letters postmarked on September 19, 2017 were delivered to addressees "George H.W. Bush" and "Barack Obama's," contained the same letter, and at least the letter sent to George H.W. Bush was confirmed to have contained white powder. The white powder was assessed by a laboratory and deemed to be non-hazardous material.

39.    Twelve more letters were mailed between September 25th and 29th, 2017 to George W. Bush, Barack Obama's, George H.W. Bush, The Trump Organization, and a private Law Office. Each of the letters sent to a former POTUS required substantial law enforcement resources to properly assess, document, and preserve the evidence.

40.    On October 3, 2017, three letters were mailed to multiple former POTUS's, a private Law Office, and a private citizen in Minneapolis. The letters were identical and stated, "MEMBER OF UNSTOPPABLE FORCE....THIS IS WHAT THERE WORKING ON...PIPE BOMB [proceeded by photograph of an IED and soldering iron]...UNSTOPPABLE FORCE, DO YOUKNOW[sic] WHAT HAPPEN IN LAS VEGAS SHOOTING? THERE MORE COMING TOWARD YOUR WAY....." On the night of October 1, 2017, a shooter opened fire on a crowd attending a concert from a hotel room in Las Vegas, Nevada, killing fifty-eight people and wounding over five hundred.

41.    On October 10, 2017, a letter was sent to the White House, stating, "Better watch out for these people. They are planning to do it for the next concert, just like Las Vegas shooting....big gun and pipe bomb."

42.    On October 17, 2017, three letters were recovered from the NEIGHBORHOOD COLLECTION BOX on West Way. All three letters were two pages, identical in content and were addressed to the FBI Sacramento office, FBI New York City office and the White House. None of the letters contained a return address. The letters stated

13

that two people, identified in the letter by name and photograph (a headshot or a photograph cropped to a headshot), "are the main idea to plot everything, pipe bomb and gun shooting. The second page of the letter stated, "They are going to kill people on New Year Day in New York. Person 3 and Person 1 have more than 10 high power guns togerhter[sic]." The letters contained the words, "UNSTOPPABLE FORCE." At the end of the second page, the letter contained the name of the FBI Agent that had previously interviewed him, as well as the address for the FBI Sacramento Office.

43. On October 30, 2017, fifteen (15) letters were recovered from the NEIGHBORHOOD COLLECTION BOX located on West Way in Oroville, California. The letters were addressed to FBI Offices throughout the United States. The letters were assessed in the field using specialized equipment before being taken to a Laboratory for additional testing. The letters stated, "UNSTOPPABLE FORCE, Are planning to bomb and kill all the people with in rang[sic], New Year Day...[full name of Person 3] and [full name of Person 4] have more than 10 high power guns. Going to make fireworks on NEW YEAR DAY...Contact, [name of FBI Special Agent 1], 2001 Freedom Way, Roseville, CA 95678."

44. As previously stated, FBI Special Agent 1 gave his FBI business card to XIONG, upon XIONG's request, at the completion of his interview on August 18, 2017. The FBI business card contained FBI Special Agent 1's name, title, and the Sacramento FBI field office address, 2001 Freedom Way, Roseville, CA 95678.

45. On November 7, 2017, identical letters were sent to HMONG TV, in Minneapolis, Minnesota, and to the FBI's Boston Office stating, "I need one million dollars or Donald Trump is dead. I had already given you the people that are in the UNSTOPPABLE FORCE. I will be watching the FBI system alert. Drop it off at McDonald at Lyndale, MN." The letter goes on to list different types of guns next to names of people associated with XIONG and Person 2. It further states, "Making more pipe bomb for New Years." Finally, on the fourth and last page of the letter, beneath a photograph of XIONG, the letter states, "FUCK FIB, [name of FBI Special Agent], 2001 Freedom Way, Roseville, CA 95678, His family is NEXT." This letter, like many of the letters, contains headshot photographs of various individuals with their purported name above the photograph as well as addresses in

14

Minnesota. The photographs are headshots and some appear to have been cropped from a larger photograph.

46.     On November 13, 2017, twenty (20) letters were recovered from the NEIGHBORHOOD COLLECTION BOX on West Way in Oroville, California and were identical to the letters mailed on November 7, 2017 with the extortion demand. The letters were addressed to fourteen (14) separate FBI Offices within the United States and six (6) public or private locations in Minneapolis. Based on the threatening language directed to FBI Special Agent 1 and his family, FBI Special Agent 1 was removed as an investigator on the case. Additional resources were expended to investigate the threats and insure the safety of FBI Special Agent 1 and his family.

**Use of the County Law Library**

47.     The Investigating Agencies determined that the SUBJECT VEHICLE was in the vicinity of the Butte County Public Law Library ("Law Library") on November 20, 2017 between 3:00 p.m. and 3:16 p.m. Pacific Standard Time (PST). On November 21, 2017, FBI Agents interviewed Law Library staff that could not be sure whether XIONG was in the Law Library the previous day. Law Library staff offered for Agents to review three (3) publicly available computers.

48.     Agents conducted a cursory review of the publicly available computer nearest the entrance to the Law Library. The time of the computer was accurate when checked with the FBI Agent's telephone. A review of "Recent Items" within Microsoft Word revealed a list of documents that appeared pertinent to the case. The following documents were accessed through a USB port, (E:/) drive, on the computer but copies of the identified documents could not be opened by FBI during it review. A check of the (E:/) drive showed that a removable disk was modified on November 20, 2017 at 3:14 p.m. The computer provided the following details about the documents:

| File Name | Date/Time Created | Date/Time Modified | File Size |
|---|---|---|---|
| UNSTOPPABLE FORCE | 11/16/2017 1:56 PM | 11/20/2017 3:13 PM | 367 bytes |

| FORCE | 11/16/2017 | 11/20/2017 | 281 bytes |
|---|---|---|---|
| | 1:59 PM | 3:10 PM | |
| FBI ADDRESS | 11/16/2017 | 11/20/2017 | 349 bytes |
| | 1:51 PM | 3:04 PM | |
| pic | 11/20/2017 | 11/20/2017 | 321 bytes |
| | 3:04 PM | 3:14 PM | |
| pix | 11/16/2017 | 11/16/2017 | 321 bytes |
| | 2:00 PM | 2:01 PM | |
| [Person 1's first name] bro | 11/16/2017 | 11/16/2017 | 332 bytes |
| | 1:55 | 1:56 PM | |

49. A review of the Microsoft Windows logs revealed that a Microsoft session appeared to end at 3:14:03 p.m. on November 20, 2017 and lasted for 723 seconds, with 600 seconds of active time. The Investigating Agencies were also able to determine that the SUBJECT VEHICLE was in the vicinity of the Law Library on November 16, 2017 between 1:41 p.m. and 2:03 p.m. In Summary, a public computer at the Law Library was utilized to access documents with relevant names peculiar to the investigation on two separate dates for narrow windows of times where the SUBJECT VEHICLE was present.

**Purchase of Supplies at Walmart and Subsequent Letters**

50. On November 21, 2017, XIONG was observed on video surveillance entering the Walmart, located at 465 Cal Oak Road, Oroville, California 95965, at approximately 5:08 p.m. XIONG walked directly to the Money Services area of the store, where he sent a $150.00 International MoneyGram to a person in Laos. XIONG listed his name, Kao Xiong, the address of his aunt and uncle's Oroville residence where XIONG previously resided, and the telephone number (530) XXX-1352. XIONG signed an agreement of the MoneyGram transaction. At the same terminal, register number 63, XIONG purchased forty (40) postage stamps tendering cash. On December 5, 2017, a Walmart employee told SA Scott Wales that Walmart has been selling only Christmas themed stamps since November 1, 2017. The SUBJECT VEHICLE was observed in the Walmart parking lot at the time XIONG entered the store.

16

51.     On November 22, 2017, XIONG was observed on video surveillance entering the Walmart, located at 465 Cal Oak Road, Oroville, California 95965, at approximately 7:44 p.m. XIONG walked to the Men's clothing, stationary, and auto sections of the store before proceeding to self-checkout register number 44 at 8:01 p.m. The receipt from register 44 at that date and time shows that XIONG purchased a black sweatshirt, forty (40) count Pen + Gear brand "privacy tint" envelopes, and twelve (12) count Firm Grip brand disposable vinyl gloves. The SUBJECT VEHICLE was observed in the Walmart parking lot at the time XIONG entered the store.

52.     On November 23, 2017, the Investigating Agencies determined that the SUBJECT VEHICLE was in the immediate vicinity of the NEIGHBORHOOD COLLECTION BOX on West Way in Oroville, California. On the same date, at approximately 8:25 p.m., an FBI Agent placed an 8½" x 11" sheet of red construction paper with the Agent's last name, first initial, and the date and time in the NEIGHBORHOOD COLLECTION BOX. This was done to help determine which letters XIONG may have placed in the NEIGHBORHOOD COLLECTION BOX. The letters XIONG placed in the NEIGHBORHOOD COLLECTION BOX along with any other letters placed in the NEIGHBORHOOD COLLECTION BOX prior to the placement of the red paper would appear below the red paper. Letters placed in the NEIGHBORHOOD COLLECTION BOX after placement of the red paper would appear on top of the red paper.

53.     On November 28, 2017, the next time the mail was collected from the NEIGHBORHOOD COLLECTION BOX on West Way, USPIS Lemaire recovered twenty (20) letters that were underneath the red sheet of construction paper left by the FBI Agent. The letters were addressed to various FBI offices; the White House; and the Minneapolis police, welfare, bank and Public House (a county courthouse). All of the letters had typed addresses and a postage stamp from what appears to be the same set of Christmas-themed varieties. Fifteen of the letters were opened and contained one sheet of paper that stated, "UNSTOPPABLE FORCE, PIPE BOMB, 12/25/17."

54.     On December 6, 2017, the Investigating Agencies determined that the SUBJECT VEHICLE was in the vicinity of a blue USPS collection box at approximately 5:10 p.m., located on the east side of Lincoln Street, between Miner's Alley and Bird Street,

in Oroville, California. A private business provided surveillance footage showing a black sedan approaching the collection box at 5:10:48 p.m., a figure exiting the vehicle in the direction of the collection box and immediately returning to the vehicle.[4] The vehicle then proceeds southbound on Lincoln Street at approximately 5:11:46 p.m.

55.     On December 7, 2017, USPS collected three letters from the blue collection box on Lincoln Street. The letters were addressed to FBI Sacramento, Donald Trump, and the White House. The contents of the letters included, "UNSTOPPABLE FORCE, PIPE BOMB AND FUCK ALL WHITE TRASH...All this time FBI can't do SHIT to your force."

56.     On December 8, 2017, FBI Los Angeles received a letter that included the following words, "UNSTOPPABLE FORCE, My parents are the one who is responsible for all the letters I have sent. Even Kao parents agree with my brother [Person 1 first name] to lock up Kao...Person 1 Have marry [Person 2] and trying to frame Kao Xiong...FUCK FIB, [name of FBI Special Agent 1], 2001 Freedom Way, Roseville, CA 95678, I know where you live and your assign partner." This letter did not have a post-mark.

57.     The FBI office in Waterloo, Iowa received a letter postmarked from "Sacramento CA 957" on December 14, 2017, which in includes FBI Special Agent 1's name and work address as well as the names and addresses of several individuals purportedly in the Unstoppable Force. The letter states, "We're going to be where Donald Trump will be held a campaign. That will be his last night of being a President. We will be bombing 10 FBI building." Two other FBI offices reported receiving similar letters in December 2017.

## Pattern of Life

58.     On September 26, 2017, FBI Agents observed XIONG departing from his place of employment, Mary's Gone Crackers, and driving the SUBJECT VEHICLE. This surveillance terminated after XIONG drove to the SUBJECT RESIDENCE, located at 1970 Elgin Street, Oroville, CA 95966.

---

[4] The surveillance footage is not clear enough to determine the identity of the individual exiting the vehicle, however, based on the investigation to date, XIONG appears to be the only individual who drives the SUBJECT VEHICLE. The time shown on the surveillance footage was actually 17:08:06. However, when I reviewed the private business surveillance system, the time displayed by the surveillance system was 2 minutes, 42 seconds slower than actual time, as referenced by Agent's cell phone. 5:10:48 p.m. reflects the adjustment to actual time to properly compare the surveillance footage.

59.     On November 14, 2017, FBI Agents observed XIONG in Buffalo Wild Wing's Restaurant, located at 845 East Avenue, Chico, California at approximately 7:00 p.m. The Agents observed that XIONG was wearing a long sleeve, grey collared sweat shirt and black pants. A review of XIONG's Facebook Account, previously identified as profile Kao GK Xiong, revealed that a photograph was posted of XIONG at 6:27 p.m. at a BWW table with chicken wings, along with the caption, "Just stopping by...- [emoji] feeling relaxed at Buffalo Wild Wings." XIONG was wearing a grey sweat shirt in the Facebook photograph. XIONG walked alone to the SUBJECT VEHICLE and entered the driver's seat. XIONG drove directly to the SUBJECT RESIDENCE, opened the garage door and drove his vehicle into the garage. The garage door was shut and lights came on upstairs in the SUBJECT RESIDENCE.

60.     The Investigating Agencies have been able to determine that the SUBJECT VEHICLE is parked in the vicinity of the SUBJECT RESIDENCE overnight since November 14, 2017. XIONG departs his residence on most weekdays and typically leaves between 5:30 a.m. and 5:40 a.m. This warrant is requesting night-service based on the XIONG's pattern of life, for the safety of XIONG and for the Investigating Agencies.

**Explosives**

61.     Based on my training and experience, and discussions with FBI Special Agents who are designated as a Special Agent Bomb Technician and who are certified as a Bomb Technician by the FBI Hazardous Devices School, I know that pipe bombs are the most common improvised explosive device (IED), and represent approximately 90% of the IEDs handled by bomb technicians in the United States.

62.     A pipe bomb is made out of pipe that can be either copper, pvc, abs, or galvanized steel and is usually capped on the ends with end caps, but can also be closed with other forms of caps that close the pipe. Most pipe bombs use a low explosive such as smokeless powder, black powder, pyrodex, flash powder, or an improvised powder such as potassium chlorate and sugar. A pipe bomb can also use a high explosive filler (commercial, military, improvised) with any type of high explosive available such as C-4, Tannerite, PETN, ETN, etc. Various Explosive Chemical Precursors used in the manufacture of improvised explosives such as Tri Acetone Tri Peroxide can be made with common

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT
AND CRIMINAL COMPLAINT

household chemicals such as Acetone, Hydrogen peroxide and Sulfuric Acid. Pyrotechnic and fireworks and flash powders used to manufacture fireworks can also be used to make an IED.

63.     The pipe bomb can be set off using time fuse, an electrical match, a detonator, a chemical reaction, or a mechanical system. The electrical system used to set off a pipe bomb requires a switch, a battery, and an initiator (i.e. electric match). There are various chemicals that can be used to set off an explosive device such as but not limited to potassium permanganate and glycerin. A mechanical system to set off an explosive device could also be used such as, but not limited to, a mouse trap that hits the back end of a 22 caliber blank shell attached to a pipe bomb. A detonator, or blasting cap, could be used to set off a pipe bomb. Electronics can be used as switches and electrical wire is used to send current down to the load to set off the IED.

64.     Various and assorted tools can be used to make IEDs to include but not limited to wrenches, saws, screwdrivers, soldering irons, wire cutters, saws, pliers, drills, etc. Glues and tape can be used to make PVC pipe bombs. Lubricants such as Vaseline can be used to safely make a pipe bomb or used in the manufacture of Poor Man's C-4 (potassium chlorate and Vaseline), which is an improvised high explosive.

## PROBABLE CAUSE THAT EVIDENCE WILL BE FOUND AT THE LOCATIONS TO BE SEARCHED

65.     There is probable cause to believe evidence of the crimes identified above will be found in the Subject Residence because:

> a. XIONG appears to be regularly sending threat or hoax letters. To date, the Investigating Agencies have identified over 150 letters that they believe XIONG has deposited into the mail since January 2017. Each of these letters appears to have been created using a computer because almost all of the letters are typed and some letters contain more than one font and/or what appear to be computer printed photographs. Based on the number and frequency of the letters, XIONG is believed to be using a computer and printer at a place he frequents.

b. XIONG is known to frequent his residence, his place of employment, his Aunt and Uncle's home in Oroville, Buffalo Wild Wings on Tuesdays, and the gym. I know based on my training and experience that individuals involved in creating threat and hoax letters typically try to conceal their activity and work in a private place. Based on surveillance, XIONG is believed to live alone. XIONG's job is located in a factory and is a laboring job, not an office job, making it less likely that he is creating these letters at his place of employment. Further, the letters contain address labels that appear to be printed from a computer and then cut out from a larger sheet of paper. Accordingly, XIONG likely needs tools such as scissors and adhesive, as well as a space to prepare the letters. The Investigating Agencies are only aware of two instances where XIONG may have utilized a public computer (at the Law Library in Oroville, California) in relation to the letters. However, XIONG was only at the library for a short period of time, and the library computer was used to open previously created files from a removable storage device. Based on my training and experience, I know that individuals typically keep removable storage devices in their residence, vehicle, or on their person.

c. Based on my training and experience, and the number of letters identified in this case, it is likely that evidence of their manufacture will be found in the SUBJECT RESIDENCE.

66. There is probable cause to believe evidence of the crimes identified above will be found in the Subject Vehicle because:

a. The Investigating Agencies have probable cause to believe that the SUBJECT VEHICLE has been utilized to transport the hoax/threat letters and to purchase materials in furtherance of the crime. The SUBJECT VEHICLE is registered to XIONG, it is the only vehicle XIONG is known to use for transportation, and XIONG is the only person that has been observed by the Investigating Agencies utilizing

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT
AND CRIMINAL COMPLAINT

the SUBJECT VEHICLE. The Investigating Agencies know that XIONG has used the SUBJECT VEHICLE to (1) travel to Walmart to purchase supplies (envelopes and stamps) that are likely related to the letters, (2) to travel to the Law Library, where XIONG appears to have used a portable digital/electronic storage device to open documents related to the mailings, and (3) to travel to at least two mailboxes where letters have been deposited. Because XIONG has used his vehicle to facilitate necessary steps to prepare and mail the threat/hoax letters it is likely there may be letters or evidence related to the letters in his vehicle.

67.    There is probable cause to believe evidence of the crimes identified above will be found on the Subject Person because:

a.    Based on the facts set forth above as well as my training and experience, it is likely that evidence will be found on the person of Kao XIONG because individuals tend to keep evidence such as electronic storage devices, cell phones, stamps, receipts, password lists, and identification documents in their hands, pockets, bags or purses which are carried with them. Furthermore, individuals typically keep photo identification on their person or bring it to the door when a search is executed in order to identify themselves to law enforcement. In this case, the Investigating Agencies know that XIONG has carried his cell phone on his person to places such as Buffalo Wild Wings. It also appears that XIONG has carried a portable media device to places like the Law Library and letters or materials to prepare letters from one place to another (i.e., Walmart and various mail boxes).

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

68.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure

22

of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

b. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

c. "Digital device" includes any device capable of processing and/or storing data in electronic form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet computers, computer servers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices such as modems, routers and switches, and electronic/digital security devices, wireless communication devices such as mobile or cellular telephones and telephone paging devices, personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming devices, global positioning satellite devices (GPS), or portable media players.

69.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT RESIDENCE, SUBJECT VEHICLE, and on the SUBJECT PERSON, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

70.     Probable cause. I submit that if a computer or storage medium is found in the SUBJECT RESIDENCE, SUBJECT VEHICLE, or on the SUBJECT PERSON, there is

23

probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    71.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache.

72.     Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBEJCT RESIDENCE or SUBJECT VEHICLE, or found on the SUBJECT PERSON:

> a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

> b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of

25

session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under

investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

73. Necessity *of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking

27

of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28

74.     Nature *of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

75.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the SUBJECT RESIDENCE, on the SUBJECT PERSON, and in the SUBJECT VEHICLE, described in Attachments A-1, A-2, and A-3, respectively. I respectfully request that this Court issue a search warrant for the SUBJECT RESIDENCE, SUBJECT PERSON, and SUBJECT VEHICLE, authorizing the seizure of the items described in Attachment B.

76.     Based upon the foregoing, there is probable cause to believe that Kao XIONG committed violations of 18 U.S.C. § 844(e). Accordingly, I also request that this Court issue an arrest warrant and criminal complaint for Kao XIONG.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK**

29

## REQUEST FOR SEALING

77.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, affidavit and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure of these materials would give the target of the investigation an opportunity to destroy evidence, change patterns of behavior, or flee from prosecution.

Respectfully submitted,

Scott C. Wales
Special Agent
Federal Bureau of Investigations

Subscribed and sworn to before me on: Dec. 21, 201?

The Honorable Deborah Barnes
UNITED STATES MAGISTRATE JUDGE

Approved as to form by AUSA SHELLEY D. WEGER

30

# ATTACHMENT A-1

## DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 1970 Elgin Street, Oroville, CA 95966, is identified as follows:

A two-story residence, with the living space on the second story and a garage/ storage area on the first level. The residence is white in color, with black trim around the second-story windows. There is a stairwell on the northeast side of the building that is believed to be the only entrance to the second level containing the living space. The first level garage/ storage area has a sliding white metal barn-door on the east side of the south wall of the residence facing the street, and a roll up metal door on the west side of the south wall facing the street. A black mailbox is on the east facing wall close to the south corner. The black mailbox has the numbers "1970."

The search is to include all rooms, attics, basements, garages, storage rooms, trash containers, outbuildings of any kind, attached or unattached, and all other areas within the curtilage, as well as, any digital device(s) or other electronic storage devices found therein.

Photograph of South wall of Residence (includes the SUBJECT VEHICLE):



Photograph of Residence from West



## ATTACHMENT A-2

### DESCRIPTION OF PERSON TO BE SEARCHED

The person of Kao Xiong, date of birth February 15, 1984, an Asian male, approximately 5'3" in height, with Black hair and brown eyes. His photograph appears below. The search of Kao Xiong shall include his person (including major case prints) clothing and personal belongings, including backpacks, briefcases and bags, any digital device(s) and other electronic storage media found thereon/therein that are within Xiong's immediate vicinity and control at the location where the search warrant is executed within the Eastern District of California and that may contain the items called for by Attachment B to this warrant.



## DESCRIPTION OF VEHICLE TO BE SEARCHED

The vehicle, described as a 1996 black Honda Civic bearing California license plate "3SHB677", Vehicle Identification Number (VIN) 1HGEJ7126TL057559, registered through the California Department of Motor Vehicles to KAO XIONG, 1632 Crest Drive, Oroville, CA 95965 and registered from 7/2/2017 to 7/2/2018.



## ATTACHMENT B

### Items to be Seized:

All evidence, in whatever form, that relates to or constitutes a violation of 18 U.S.C. §§ 115 (threats to law enforcement); 844(e) (threat or hoax regarding explosive), 871(a) (threats against the President); 875(c) (threat to injure transmitted via interstate communication); 876(b) (extortion); 1038(a)(1) (hoax), including:

1.      All documents, records, correspondence, items, information and data relating to violations of the statutes described above including:

      a.      Any items related to the physical mailing of a letter as well as computer printed address labels cut from larger sheets of paper, including but not limited to, letters, returned mail, paper, envelopes, stamps, tape, glue, scissors, labels, and gloves.

      b.      Any physical items, images, documents, artifacts, either handmade or in mechanical form that relate to the threat letters, including but not limited to, lists of addresses, including the addresses of the White House, Presidents, Former Presidents, Trump owned entities, Law Enforcement, FBI offices, any other federal, state, or local entities, television and radio stations, and addresses in Minnesota; photographs of any public officials, the families of public officials, and law enforcement agents; anything that references "Unstoppable Force."

      c.      Any flour, white powder, or substance or items that can be made to appear as white powder.

      d.      Black powder.

      e.      Any documents containing handwriting that can be used as a handwriting exemplar for comparison with handwriting appearing in threat /hoax letters, including but not limited to, notes, journals, letters, and personal checks.

      f.      Any weapons, including firearms and ammunitions, and projectiles.

g. All information relating to Law enforcement agents, including but not limited to, business cards, notes, research, photographs, and agents' business or home addresses.

h. Information relating to the mailing of letters or letters sent, including but not limited to, notes or information about the location of mail boxes and post offices, or where and how mail is processed.

i. Receipts of items purchased pertaining to any items identified within this attachment.

j. Any opium or opiate derivatives.

k. Any documents, photographs, communications or other correspondence, including electronic mail, concerning assassinations, bombs, or shootings, or plans or threats concerning assassinations, bombs, or shootings.

l. Indicia of use, occupancy, ownership and/or control of the SUBJECT RESIDENCE, SUBJECT VEHICLE, and any DEVICES, including, identification documents such as passports, drivers' licenses, social security cards; vehicle registration documents; addressed mail that has been received; photographs; keys; and bills, receipts, and statements, including for rent and utilities (gas, electric, telephone, cell phone, internet).

2. Any items associated to improvised explosive devices (IED), including pipe bombs, or other explosives, their components, and/or precursors, including but not limited to the items described below:

a. Pipes (metal/plastic/composite) and pipe end caps (metal/plastic/composite).

b. Fuses and other ignition systems.

c. Power sources. (Example: Batteries.)

d. Wire.

e. Switches.

f.   Timing mechanisms. (Example: Watches, Kitchen timers.) Accelerants, Black powder, manufactured or improvised, and their containers.

g.   Explosives and detonators, commercial, military, improvised.

h.   Chemicals used in the manufacture of improvised explosives and their containers.

i.   Hobby or pyrotechnic components and their containers.

j.   Adhesives. (Example: Glues and tape such as Gorilla glue, Metal/PVC glue, Teflon tape, electrical tape, duct tape, Gorilla tape.)

k.   Lubricants. (Example: Vaseline.)

l.   Tools. (Example: wrenches, drills, saws, wire brushes, vise grips.)

As used above, the terms "documents," "records," "correspondence," "information," and "data" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.   For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer, digital or electronic device,[5] or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, DEVICE):

a. Evidence of who used, owned, or controlled the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing

---

[5] Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

"Digital device" includes any device capable of processing and/or storing data in electronic form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet computers, computer servers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices such as modems, routers and switches, and electronic/digital security devices, wireless communication devices such as mobile or cellular telephones and telephone paging devices, personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming devices, global positioning satellite devices (GPS), or portable media players.

history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. Evidence of software that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. Evidence of the lack of such malicious software;

d. Evidence indicating how and when the DEVICE was accessed or used to determine the chronological context of access, use, and events relating to crime under investigation and to the computer user;

e. Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. Evidence of the attachment to the DEVICE of other storage devices or similar containers for electronic evidence;

g. Evidence of counter-forensic programs (and associated data) that are designed to eliminated data from the DEVICE;

h. Evidence of the times the DEVICE was used;

i. Passwords, encryption keys, and other access devices that may be necessary to access the DEVICE;

j. Documentation and manuals that may be necessary to access the DEVICE or to conduct a forensic examination;

k. Records of or information about Internet Protocol addresses used by the DEVICE;

l. Routers, modems, and network equipment used to connect computers to the Internet;

m. Records of or information about the DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms, that the user entered into any Internet search engine, and records of user-typed web addresses; and

n. Contextual information necessary to understand the evidence described in this attachment.